IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BRITTNEY SUE P.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BRITTNEY SUE P.,
A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ROBERT P., APPELLANT.

Filed May 28, 2019.    Nos. A-18-816, A-18-982.

Appeals from the County Court for Garden County: RANDIN R. ROLAND, Judge. Appeal in No. A-18-816 dismissed. Judgment in No. A-18-982 affirmed.

Robert S. Harvoy for appellant.

Philip E. Pierce, Garden County Attorney, for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

INTRODUCTION

These consolidated appeals arise from the decisions of the county court for Garden County, sitting as a juvenile court, regarding Robert P.'s access to his daughter, Brittney Sue P. In case No. A-18-816, Robert appeals from the juvenile court's order directing that Brittney Sue be placed out of Robert's home. We dismiss this appeal for lack of jurisdiction. In case No. A-18-982, Robert appeals from the juvenile court's order denying Robert's motion to lift the suspension of his visitation and granting the State's motion for relief from providing reasonable efforts. We affirm that order.

- 1 -

BACKGROUND

Brittney Sue was born in December 2017 to Robert and Veronica M., who is developmentally disabled. Veronica is not a party to these appeals and we discuss her involvement only as necessary to address Robert's assigned errors. In 2016, Brittney Sue's four siblings were removed from Robert and Veronica's care due to "chronic neglect." Because of the ongoing case with her siblings, a juvenile petition was filed shortly after Brittney Sue's birth, and she was removed from Robert and Veronica's care. Brittney Sue remained in out-of-home care until she was adjudicated in January, at which time she was returned to Robert and Veronica's home.

On February 1, 2018, the juvenile court held a permanency and review hearing. The court ordered Brittney Sue to remain in Robert and Veronica's home, supervised by the Nebraska Department of Health and Human Services (Department). The court's permanency goal was set as reunification by June 1, 2018, with an alternate plan of adoption. The court ordered that Brittney Sue become current on all immunizations and directed Robert and Veronica to sign releases for all medical records regarding a medical exam on January 31.

On July 17, 2018, the juvenile court entered an order for ex parte change of placement upon the request of the county attorney. The court found that continuation of Brittney Sue in her home would be contrary to her welfare, that reasonable efforts had been made before placement to prevent or eliminate the need for removal, and that it was in Brittney Sue's best interests to be placed out of home. Although the motion is not in the record, Robert filed a motion for a hearing on the out-of-home placement the same day.

The State filed a motion to terminate Robert and Veronica's parental rights; however, we do not have the State's motion, or any evidence of the allegations it contained, in our record.

On August 1, 2018, the juvenile court held a hearing on Robert's motion objecting to the change of placement and removal of Brittney Sue. Several witnesses testified at the hearing and various exhibits were received including photographs of the family home and of Robert's van, Brittney Sue's immunization schedule, and reports from a reunification specialist and visitation workers.

Dennis O'Brien testified that he and Chantelle Reicks are Brittney Sue's caseworkers with the Department. He has been involved in Brittney Sue's case since her birth. When the Department became involved in Brittney Sue's siblings' case, they were "filthy." They had matted hair and serious upper respiratory infections. As a condition for Brittney Sue's return to her parents' home, the Department scheduled medical appointments for her twice each week. Further, unannounced visits from the Department and other providers were put in place to ensure Brittney Sue's safety. Whenever O'Brien tried to enter Robert and Veronica's home for a safety check, Robert would initially deny access to the home. Eventually, Robert would allow O'Brien inside. O'Brien admitted that he and Robert do not get along well. The previous caseworkers for Robert and Veronica's children have had difficulty with Robert, and two of them took out protection orders against Robert. Similarly, CASA volunteers struggled in their interactions with Robert.

Robert and Veronica received family support and participated in an intensive family reunification program that provides workers to enter the family home and address causes of removal. At the time of the hearing, Robert and Veronica had completed 6 weeks of the reunification program. Robert and Veronica declined to have Brittney Sue developmentally

evaluated through the public school system because they were already receiving services. Brittney Sue had not had all of her court-ordered immunizations when she was removed from Robert and Veronica's care in July. Robert and Veronica did not follow through with the service providers' suggestions. However, since Brittney Sue's birth, Robert and Veronica had not missed visits with their other children.

Robert and Veronica left their children in a van unattended on three separate occasions. On the first occasion, a family skill builder observed Veronica leave Brittney Sue and her sister in the van while the outside temperature was 97 degrees. The next day, family support workers witnessed Veronica leave Brittney Sue sleeping in the van. The day after that, CASA workers saw Brittney Sue's two brothers unattended in the van while the keys were in the ignition. The boys were running the windows up and down and playing with the music. Neither Robert nor Veronica seemed to understand why it would be a problem to leave an infant in a hot vehicle.

Robert and Veronica's property contained multiple, inoperable vehicles. The children constantly played in these vehicles while unattended. The children had access to various farm animals, and rattlesnakes had been sighted on the property. O'Brien and Reicks discovered two guns in one of the vehicles in full reach of the children. They also discovered a long rifle in a case in the house. That rifle had a round in the chamber and the safety was not on. The property also contained unlocked, unsafe appliances and exposed wires that could injure the children. Robert allowed the children, three at a time, to ride his tractor while the sickle bar mower was attached. The children were unrestrained on the mower and could have fallen off and become injured by the mower.

The basement of Robert and Veronica's house had a leaking pipe. As a result, the basement contained slime, mold, and mildew. The slime caused the basement to be slippery, and nothing prevented the children from entering the basement. The basement's mold posed possible health complications for the children as each of them had tested positive for mold allergies. In the winter, the family burned their trash in a wood-burning stove in the basement, which was a health hazard. The children's drawers contained shredded materials and mice feces, which could cause an infant to become seriously ill if ingested.

Considering Robert and Veronica's lack of cooperation and the living conditions they provided, the Department requested Brittney Sue be removed from Robert and Veronica's care. When Brittney Sue was taken into the Department's custody in July 2018, her clothes were soaked with urine and she had a serious yeast rash.

Reicks testified that she became involved in Brittney Sue's case in May 2018. She investigated Robert and Veronica's house in June 2018. Although the house was generally organized, it had a "musty" or "mildewy" odor, and there was a layer of dust on most items inside it. Reicks and O'Brien had spoken with Robert and Veronica multiple times about the safety changes that needed to be made in their home. Robert and Veronica were not receptive to concerns raised during meetings about Brittney Sue. Robert would become angry and make accusations against the Department or O'Brien. As a result of Robert's behavior, the team meetings sometimes ended early. When Reicks spoke with Brittney Sue's medical provider, she learned Brittney Sue had received only 1 of her 25 scheduled immunizations. Brittney Sue received one other vaccination before she was removed from Robert and Veronica's home.

Breanna Carman, a therapist with Saint Francis Community Services, testified that she met with Robert and Veronica once or twice a week as part of the reunification program. The program set seven detailed goals for Robert and Veronica's family. Weekly reports were made regarding the parents' progress.

Robert and Veronica's progress during the first 3 weeks was slower than expected. Robert did not sign the paperwork required for the program until the program's third week. During that week, Carman recognized safety concerns about the children playing on an unanchored swing set and with a rototiller. She was also concerned about a pile of wooden shingles with staples in them that remained on the property. The program's skill builder began working with Robert and Veronica during the third week. The fourth week proceeded without significant progress. In the fifth week, Robert stated that he did not agree with the program's parenting techniques, but he would "try."

The sixth week was the last week that Robert and Veronica participated in the program. During that week, support workers discovered the children unattended in a van. Robert and Veronica met with Carman at Robert's attorney's office. Because the other children were sick, only Brittney Sue accompanied Robert and Veronica. Brittney Sue cried throughout Carman's visit because of a wet diaper. Although Carman pointed out the diaper to Robert and Veronica, they did not change it. However, Veronica usually changed Brittney Sue's diaper when it was soiled.

In her report on the sixth week, Carman reported minimal progress on six of the goals and no progress on another of the goals. The weekly reports all identify Robert's anger as a safety concern. Carman was also concerned that Robert was committing domestic violence against Veronica, which was particularly concerning due to Veronica's intellectual disability. Generally, Carman observed Veronica to have affectionate and attentive interactions with Brittney Sue during her visits. However, Carman was working with Robert and Veronica as a family unit; and because Robert made little progress on the program's goals, the family also made little progress on the program's goals.

Callie Schliz, a skill builder with Saint Francis Community Services, testified that she worked in conjunction with Carman on Robert and Veronica's case. She described the incident during one of her visits when she found Brittney Sue and her sister in the van. When she arrived for the visit, Robert was in the front yard watering a flowerbed with two of his children, and Veronica was inside preparing dinner. When Schliz asked where Brittney Sue and her sister were, Veronica told her that they were in the van and that she was about to go get them. The outdoor temperature was 97 degrees at the time. The van's windows were down and the door was open. Schliz instructed Robert not to leave children inside cars or to allow children to play in cars while that car is parked. Generally, Schliz felt that Veronica was very nurturing and attentive to Brittney Sue's needs, and Robert helped with Brittney Sue when asked.

Michelle Quinn, the Garden County sheriff, testified that she was called to Robert and Veronica's house to retrieve firearms from the property. Inside one unlocked vehicle on their property, Quinn found two single-shot shotguns, one of which was inoperable. The vehicle was unlocked, and had no ammunition inside it. She also found a loaded gun in a case inside the house. Although the case was latched, the children could easily open it. The guns were removed from the property so that they would be out of the children's reach.

Heather Hanna, a nurse practitioner, testified that Robert and Veronica told her they had personal beliefs against immunizations. They did not feel immunizations were safe for their children. As a result, Hanna only gave Brittney Sue immunizations when the court ordered them. The court received Brittney Sue's progress reports, which recorded Brittney Sue's health since her birth. Hanna did not believe failing to give immunizations to a child was abusive, and admitted that she did not give her own child some of the recommended immunizations. Hanna felt Robert was attentive to his children's health, and to her knowledge, he always followed through with her recommendations. Hanna was never told that the Department had care, custody, and control of Brittney Sue.

Cynthia Andor, an employee of an early learning program, testified that she had been working with Robert and Veronica for over a year at the time of the hearing. The program addresses parenting skills, development information, and safety information. In Andor's opinion, Veronica was doing a great job with Brittney Sue and her sister. Further, Robert was cooperative with Andor's instructions. The court received Andor's notes from her interactions with Robert and Veronica.

Andor inspected Robert and Veronica's property for hazards to children, and she helped them address those hazards. She recommended that the children never play with any of the vehicles or tools on the property. Andor was not concerned about the unloaded, inoperable shotguns found on the property, although she was concerned about the gun found inside the house. Stating that mice infestations are common in farmhouses, she was unsurprised by the discovery of mouse feces in the children's drawers. Andor admitted, however, that she did not investigate for indoor hazards. Andor also felt that she was not in the home often enough to declare the property "safe."

Andor advised Robert to concentrate on what he is doing right for his family, rather than what he thinks others are doing wrong. Because Brittney Sue scored so well on the program's evaluations, Andor did not see the need for Brittney Sue to undergo a separate developmental evaluation through the public school system. In her time with Robert and Veronica, Andor saw nothing that would indicate they were bad parents for Brittney Sue. Andor saw progress in both Robert and Veronica's parenting ability, but she could not be sure that Robert and Veronica were implementing the concepts she taught them.

Robert testified that Brittney Sue never played in the abandoned cars or tractors on his property. Andor gave him a list of hazards on his property, and he worked to address the concerns on that list. Robert explained that the gun that was found inside the house was hidden in a closet. Although it was found with the safety off, he believed the safety was on. Robert agreed to not keep guns on his property as long as his children are on the property. In compliance with the Department's instructions, Robert took Brittney Sue to the doctor every 2 weeks. He further consented to Brittney Sue receiving immunizations.

Regarding the incident when Schliz found Brittney Sue and her sister alone in a van, Robert testified that the family had just come in from working on a broken pasture gate. Before they unloaded the vehicle, Veronica briefly went inside to use the bathroom and put a pizza in the oven. Robert was outside near the van waiting for Veronica to return. The van was parked beneath a tree, its windows were rolled down, and its side door was left open. Robert did not remove the children himself because he could not carry them both alone. Brittney Sue and her sister were only left in the van for a short while.

The second vehicle incident occurred when a family support worker followed Robert home from town. After everyone parked at Robert and Veronica's house, Robert followed the support workers inside. Brittney Sue's sister was left sleeping in an unbuckled car seat in the van, with the window and side door open. Robert stated that the support worker told him that he could leave the child in the van while they spoke.

Robert explained that Brittney Sue's diaper was not wet when they arrived at his attorney's office on the day the Department removed her from his and Veronica's care. He and Veronica had run out of diapers, and they had intended to buy more while they were in town.

Robert bought traps and poison to eliminate mice from his house. Although his basement was wet, he believed the moisture came from rain and not a broken water pipe. Robert explained that Andor told him a truck on his property was a "perfect toy" for the children to play in. He also admitted to allowing the children to ride the tractor with him.

Robert admitted he was late to visits for various reasons from time to time, but denied missing them. He always called to let the support worker know when he would be late. Robert does not have only one employer, but rather works a series of jobs. He has refused work driving semis during the wheat harvest in order to avoid missing his scheduled visits.

The juvenile court entered an order on the day of trial, which order denied Robert's motion objecting to the change of placement. The court specifically found a need for Brittney Sue's removal from the home. The court ordered visitation to continue as scheduled under the ex parte order. Robert appealed this order.

On September 4, 2018, the juvenile court entered orders terminating Robert's and Veronica's parental rights to Brittney Sue's four siblings. Although the motion is not in our record, the State filed a motion requesting that the parents' visits with Brittney Sue be suspended after the termination of their parental rights to the other children. The court suspended Robert's visitation, but allowed Veronica's visitation to continue. Robert moved to lift the suspension of his visitation. The State also filed a motion to relieve the Department from providing reasonable efforts to reunify.

On September 28, 2018, the juvenile court held a hearing on Robert's motion to lift the suspension of his visitation and the State's motion for relief from providing reasonable efforts. The court received letters from the Department, dated September 10 and 11, 2018, detailing the Department's recommended visitation schedule. Although the September 10 letter recommended supervised public visitation, the September 11 letter recommended that Robert receive no visitation. The court received a letter from Robert's therapist, which explained that he participated in individual therapy and anger management. It also stated that Robert was coping with the loss of Veronica, who had apparently left him. The court received a report from Brittney Sue's guardian ad litem, dated September 13, that recommended ceasing Robert's visitation with Brittney Sue. The report also noted that reasonable efforts to reunify were no longer required because the court had terminated Robert and Veronica's parental rights to their other four children. The court received the transcribed testimony from the termination hearing of Robert's other children.

Robert testified at the September 28, 2018, hearing that he has a good bond with Brittney Sue. He felt that continued efforts to reunify him with Brittney Sue was best for her because she needs two parents. Robert complained that the State did not sufficiently compensate him for his travels to appointments related to his children's cases. Nevertheless, he was willing to continue

counseling even if the State stopped paying for it. He was not in favor of the supervised, public visitation that the Department had recommended because he felt the places the Department provided were "filthy" and "dirty." To reduce his expenses, he asked that the visits occur in his home. He agreed to provide for Brittney Sue's basic needs during visitation, but he was unwilling to submit to redirection. He was willing to engage Brittney Sue in age-appropriate development activities, but felt doing so would be difficult without the help of Andor.

Andor testified that from her observations of Robert, she saw no reason that he could not provide for Brittney Sue. She admitted, however, that she only spent 6 hours per month in the home with Robert and Veronica. O'Brien testified that he did not feel Andor spent sufficient time in Robert and Veronica's home to accurately assess it.

Later that day, the juvenile court entered an order denying Robert's motion to lift suspension of his visitation and granting the State's motion to relieve the Department of reasonable efforts. Robert appeals.

## ASSIGNMENTS OF ERROR

In case No. A-18-816, Robert assigns that the juvenile court erred in ordering the change of Brittney Sue's placement.

In case No. A-18-982, Robert assigns, restated, that the juvenile court erred in (1) holding a hearing on the State's motion to relieve the Department of reasonable efforts, (2) relieving the Department of reasonable efforts to reunify Brittney Sue with Robert, and (3) denying him visitation and contact with Brittney Sue.

## STANDARD OF REVIEW

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *In re Interest of Nettie F.*, 295 Neb. 117, 887 N.W.2d 45 (2016).

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018).

## ANALYSIS

### 1. APPEAL IN CASE NO. A-18-816

In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *In re Interest of Kamille C. & Kamiya C.*, 302 Neb. 226, 922 N.W.2d 739 (2019). For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. *In re Interest of Mercedes L. et al.*, 26 Neb. App. 737, 923 N.W.2d 751 (2019). Among the three types of final orders which may be reviewed on appeal is an order that affects a substantial right made during a special proceeding. *Simms v. Friel*, 25 Neb. App. 640, 911 N.W.2d 636 (2018). Juvenile court proceedings are special proceedings, and an order in a

juvenile special proceeding is final and appealable if it affects a parent's substantial right to raise his or her child. *In re Interest of Kamille C. & Kamiya C., supra*. Whether a substantial right of a parent has been affected by an order in juvenile court litigation is dependent upon both the object of the order and the length of time over which the parent's relationship with the juvenile may reasonably be expected to be disturbed. *In re Interest of Mercedes L. et al., supra*. Orders which temporarily suspend a parent's custody and visitation rights do not affect a substantial right and are therefore not appealable. *In re Interest of Danaisha W. et al.*, 287 Neb. 27, 840 N.W.2d 533 (2013).

The State asserts that we lack appellate jurisdiction because Robert did not appeal from a final, appealable order. Citing *In re Interest of Danaisha W. et al., supra*, the State argues that the August 1, 2018, order was temporary in nature because the court had scheduled a termination trial soon thereafter. We agree.

After the juvenile court in *In re Interest of Danaisha W. et al.* had temporarily suspended a mother's visitation rights with her children, the State filed a petition to terminate the mother's parental rights. The juvenile court thereafter entered an order that ended the temporary suspension of the mother's visitation rights, but imposed specific conditions on the mother's visitation. On the same day, the juvenile court scheduled a hearing on the State's motion to terminate parental rights for about 6 weeks in the future. The mother appealed the visitation order, and the Nebraska Supreme Court dismissed her appeal for lack of a final, appealable order. The court reasoned that because the juvenile court entered its order reinstating visitation with conditions so near in time to the scheduled hearing on the State's motion to terminate her parental rights, the order's affects were only temporary and did not affect a substantial right. As a result, the order was not appealable.

On the other hand, the Supreme Court found that it had jurisdiction to review the visitation order in *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). The juvenile court in that case changed the permanency plan as to the mother from goals focused on reunification to goals focused on adoption. The juvenile court explained from the bench that the Department was only required to provide services to the mother that were consistent with the children's new permanency goals. The mother appealed the permanency plan change. Before analyzing the merits of the mother's appeal, the Nebraska Supreme Court examined whether the juvenile court's order changing the children's permanency plan was appealable. The court explained that "[a]n order that adopts a case plan with a material change in the conditions for reunification with a parent's child is a crucial step in proceedings that could possibly lead to the termination of parental rights; such an order affects a parent's substantial right in a special proceeding and is appealable." 290 Neb. at 599, 861 N.W.2d at 424. Because the juvenile court's change in permanency goals effectively discontinued the Department's reasonable efforts to reunify the mother with her children, the Supreme Court found that she was disadvantaged by the order, and it was thus appealable.

We find the present case is more similar to *In re Interest of Danaisha W. et al.* than to *In re Interest of Octavio B. et al.* In case No. A-18-816, Robert appeals from the juvenile court's August 1, 2018, order, which denied his motion objecting to Brittney Sue's out-of-home placement. Unlike the order in *In re Interest of Octavio B. et al.*, the order did not alter Robert's scheduled visitation or the Department's efforts to reunify Robert with Brittney Sue. Notably, the trial on the State's motion to terminate Robert's parental rights was scheduled for less than a month

after the court entered its order, so like the order in *In re Interest of Danaisha W. et al.*, the August 1 order would only remain in effect for a matter of weeks. It is of no consequence that Robert's appeal delayed the trial on the State's motion to terminate his parental rights. As the court stated in *In re Interest of Danaisha W. et al.*, "[t]he fact that an appeal has delayed final disposition 'is unfortunate but irrelevant in [an appellate court's] determination whether the order, when issued, affected a substantial right.'" 287 Neb. at 34, 840 N.W.2d at 538.

Because the juvenile court's August 1, 2018, order was not final and appealable, we dismiss Robert's appeal in case No. A-18-816 for lack of jurisdiction.

### 2. APPEAL IN CASE NO. A-18-982

In case no A-18-982, Robert assigns that the juvenile court erred in (1) holding a hearing on the State's motion to relieve the Department of reasonable efforts, (2) allowing the Department to stop reasonable efforts to reunify Brittney Sue, and (3) denying him visitation and contact with Brittney Sue. Finding no error, we affirm.

### (a) Juvenile Court's Jurisdiction Over Hearing

Robert assigns that the juvenile court erred in holding a hearing on the State's motion to relieve the Department of reasonable efforts. He argues that by denying him visitation and discontinuing all efforts toward reunification, the court effectively terminated his parental rights, which the court lacked jurisdiction to do on account of his appeal in case No. A-18-816. We disagree.

Neb. Rev. Stat. § 43-295 (Reissue 2016) describes the juvenile courts' continuing jurisdiction over juvenile cases:

> Except when the juvenile has been legally adopted, the jurisdiction of the court shall continue over any juvenile brought before the court or committed under the Nebraska Juvenile Code and the court shall have power to order a change in the custody or care of any such juvenile if at any time it is made to appear to the court that it would be for the best interests of the juvenile to make such change.

However, the continuing jurisdiction of a juvenile court under § 43-295 does not include the power to terminate a juvenile's relationship with his or her parent pending an appeal. *In re Interest of Joshua M. et al.*, 4 Neb. App. 659, 548 N.W.2d 348 (1996), *reversed in part on other grounds* 251 Neb. 614, 558 N.W.2d 548 (1997).

The juvenile court entered an order granting the State's motion to relieve the Department of reasonable efforts and denying Robert's motion to lift the suspension of his visitation. Although these orders were a crucial step in proceedings that could possibly lead to the termination of parental rights, the orders did not terminate Robert's parental rights. Robert cites to *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015), for the proposition that an order "ceasing reasonable efforts for reunification . . . effectively terminates [a parent's] parental rights." Appellant's brief at 5. As we discussed above in our analysis of case No. A-18-816, *In re Interest of Octavio B. et al.* does not stand for such a proposition, and the court in that case did not determine that discontinuing those services or changing the children's permanency goals was

equivalent to terminating the mother's parental rights. Thus, the district court had jurisdiction to hold the hearing under § 43-295 during the pendency of the appeal in case No. A-18-816.

### (b) Brittney Sue's Best Interests

Robert's remaining assignments of error concern the juvenile court's determination that reasonable efforts to reunify Brittney Sue and Robert are no longer required and that continued visitation and contact between them are not in her best interests. The foremost purpose and objective of the Nebraska Juvenile Code is the protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law. The goal of juvenile proceedings is not to punish parents, but to protect children and promote their best interests. *In re Interest of Mercedes L. et al.*, 26 Neb. App. 737, 923 N.W.2d 751 (2019).

Thus, the relevant question for Robert's remaining assignments of error is whether the State met its burden to show that discontinuing reasonable efforts as well as disallowing visitation and contact was in Brittney Sue's best interests, and we find that it did.

### (i) Discontinuing Department's Reasonable Efforts

Robert assigns that the juvenile court erred in relieving the Department from providing reasonable efforts to reunify Brittney Sue with him. Under Neb. Rev. Stat. § 43-283.01(4) (Cum. Supp. 2018), "[r]easonable efforts to preserve and reunify the family are not required if a court of competent jurisdiction has determined that: . . . (c) [t]he parental rights of the parent to a sibling of the juvenile have been terminated involuntarily.

Here, Robert's parental rights to his four older children had been terminated involuntarily on August 4, 2018. Thus, the juvenile court was no longer required to provide Robert with reasonable efforts to reunify with Brittney Sue. And after our de novo review of the record, we find that relieving the Department of providing reasonable efforts to preserve and reunify Brittney Sue with Robert was in her best interests. Robert's testimony at the September 28, hearing showed that he was unwilling or unable to submit to the Department's guidelines. He protested the use of a neutral space for visitation, and, other than with Andor, he was not open to redirection from Department caseworkers or providers. Further, at the August 1 hearing, the testimony of caseworkers and providers demonstrated that Robert was difficult to work with. Since his children's cases began in 2016, Robert made little progress in developing parenting skills; and over the course of Brittney Sue's case, he made little progress on the goals established by the reunification program. Robert's home presents hazards that without careful parental oversight could cause Brittney Sue harm. Robert has failed to demonstrate that he appreciates these hazards. In sum, the record shows that Robert has not responded positively to the Department's past reasonable efforts to preserve and reunify the family, and continuing those efforts are not in Brittney Sue's best interests.

### (ii) Denying Robert Visitation and Contact

Robert next assigns that the juvenile court erred in denying him visitation and contact with Brittney Sue. Given our finding above affirming that reasonable efforts are no longer required to

reunify Robert and Brittney Sue, we likewise find no error in denying Robert's request to lift the visitation restriction and that such denial is in Brittney Sue's best interests.

CONCLUSION

We lack jurisdiction over Robert's appeal from the August 1, 2018, order in case No. A-18-816. We therefore dismiss the appeal.

In case No. A-18-982, we find that because Robert's parental rights to Brittney Sue's four siblings were terminated, the State was no longer required to provide reasonable efforts to preserve and reunify the family. Further, after a de novo review of the evidence, we find that suspending Robert's visitation and contact with Brittney Sue was in her best interests.

APPEAL IN NO. A-18-816 DISMISSED.
JUDGMENT IN NO. A-18-982 AFFIRMED.